IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| EDWARD M. McBRIDE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No.   14-cv-894-SCW |
| | ) |
| NATHAN CHAPMAN, DOUG | ) |
| SIMMONS, and BRANDI LITTLE, | ) |
| | ) |
| Defendants. | |

**MEMORANDUM AND ORDER**

**WILLIAMS, Magistrate Judge:**

### INTRODUCTION

Pursuant to **42 U.S.C. § 1983**, Plaintiff, who was *pro se* at the time, filed his complaint alleging deliberate indifference against Defendants. Specifically, Plaintiff alleges that Nathan Chapman, Doug Simmons, and Brandi Little were deliberately indifferent in treating his serious medical needs, related to Plaintiff's teeth and dentures. This matter is before the Court on a motion for summary judgment filed by Nathan Chapman and Bradi Little (Docs. 101 and 102). Plaintiff, now represented by counsel, has filed a response (Doc. 114). Defendants have filed a reply (Doc. 118). Defendant Doug Simmons has also filed a motion for summary judgment (Doc. 103 and 104) and Plaintiff has filed a response to that motion (Doc. 115). Based on the following, the Court **GRANTS** both motions for summary judgment.

## FACTUAL BACKGROUND

On August 18, 2014, Plaintiff filed a complaint alleging deliberate indifference related to treatment for his teeth and a denture that he received against Defendants (Doc. 1). As narrowed by the Court's threshold order (Doc. 8), Plaintiff alleges that Defendant Chapman took a persistent, yet ineffective, course of treatment when he provided Plaintiff with dentures instead of ordering corrective surgery for his gums, which suffered from excess bone and an undercut ridge (Doc. 8, p. 2). As a result of only being provided with dentures, Plaintiff was subjected to pain and could not eat because of the discomfort associated with the dentures. Plaintiff also alleges that Defendant Little failed to prescribe him with pain medication (*Id*.). Defendant Thomas Spiller, as warden at Pinckneyville, was left in the case in his official capacity only, for purposes of injunctive relief (*Id*. at p. 6). As Plaintiff was later transferred from Pinckneyville Correctional Center, Defendant Doug Simmons, was substituted as the proper defendant for injunctive relief, in place of Thomas Spiller (Docs. 86 and 89).

While at Lawrence Correctional Center, in December 2011, Plaintiff had certain upper teeth extracted, including teeth #'s 2, 5, 6, 10, and 11 (Doc. 102-2; 102-1, p. 16). Plaintiff then transferred to Menard in January 2012 and saw the dentist on January 27, 2012 (Doc. 102-1, p. 14 and 16-17; 102-3; 102-4). Although Plaintiff requested dentures, he was told his gums had not yet healed (Doc. 102-1, p. 17). He was placed on a soft diet (Doc. 102-4, p. 1). Plaintiff testified that he did not receive dentures at Menard because the facility was also on lockdown (Doc. 102-1, p. 14). Plaintiff again was

examined while at Menard on May 21, 2012 (Doc. 102-4, p. 1). The notes from that examination indicated that ridges were present in the area of extraction and were still sore to pressure (*Id.*). Plaintiff was told that he needed further healing and possible pre-prosthetic surgery (*Id.*). Plaintiff was to be evaluated in three months for an upper denture or possible surgery (*Id.*). Plaintiff's soft diet was continued (*Id.*).

Plaintiff transferred to Pinckneyville Correctional Center on April 26, 2013 (Doc. 102-3, p. 2). Chapman first reviewed Plaintiff's records and x-rays on May 2, 2013 (Doc. 102-4, p. 1). Chapman saw Plaintiff on May 6, 2013 and noted that his gums had healed within normal limits and noted an undercut on his maxillary ridge, meaning he had excess bone in certain areas on his gum ridge (*Id.*; 102-5, p. 22). Plaintiff noted that he was not interested in a soft diet and testified that Pinckneyville's version of a soft diet bothered his gums (Doc. 102-4, p. 1; 102-1, p. 19-21). Plaintiff also complained that he had sharp bone edges on his gums, but Chapman indicated that the denture could be made to work with those (Doc. 102-1, p. 15). Chapman testified that Plaintiff was evaluated for whether Plaintiff needed a denture or first needed surgery to remove the excess bone, but Chapman felt confident that a denture could be made to work with Plaintiff's gums (Doc. 102-5, p. 22, 24). Chapman examined Plaintiff's gums, feeling the undercut and gum to determine healing (*Id.* at p. 22-23). Plaintiff was scheduled for denture impressions (*Id.* at p. 22).

Chapman began the process of creating Plaintiff's dentures. On June 19, 2012, Plaintiff had an initial alginate impression of his upper gums, including the ridge (Doc.

102-5, p. 29; 102-4, p. 2). The shade, or color of his dentures, was noted at 62 to match his lower teeth (Doc. 102-5, p. 29-30; 102-4, p. 2). Chapman noted that those impressions were sent to a lab and that if the technician making the dentures felt it would be difficult to make a denture given the excess bone, the lab would have contacted the prison, but the lab did not contact Chapman (Doc. 102-5, p. 36-37). On July 1, 2013, Plaintiff had a "wax bite" to determine Plaintiff's bite (Doc. 102-5, p. 30; 102-4, p. 2). On July 17, 2013 Plaintiff was fitted with an initial set of dentures but the midline was off and the dentures were sent back for resetting (Doc. 102-5, p. 31; 102-4, p. 2). Chapman testified that this was either due to Plaintiff biting down wrong in the wax or a clinical error in marking Plaintiff's bite wrong (Doc. 102-5, p. 31). Chapman remarked the midline and sent the dentures back (*Id*.). Plaintiff was fitted with another denture on July 30, 2013 and Chapman noted that the set up was much better but that Plaintiff continued to bite down differently every time (Doc. 102-5, p. 32; 102-4, p. 2). Chapman testified that he believed this was due to the fact that Plaintiff had went without upper teeth for so long, making it hard for him to bite down correctly (Doc. 102-5, p. 32). Plaintiff was happy with the setup and the appearance, however, and the denture was sent back to the lab for finalizing (Doc. 102-5, p. 33; 102-4, p. 2). Plaintiff was provided with a soft diet throughout the fitting process (Doc. 102-5, p. 28-33).

Plaintiff received his dentures on August 14, 2013 (Doc. 102-4, p. 2). Plaintiff complained that the dentures were hurting certain areas of his mouth and marked the locations (Doc. 102-1, p. 20). Chapman noted on August 26, 2013 that there were

undercuts and adjustments were necessary to get the dentures to go around the undercuts (Doc. 102-5, p. 33; 102-4, p. 2). Chapman testified that the undercuts were places where Plaintiff had a little bit more bone and that Plaintiff had excess bone growths on the right and left sides, towards the back of his mouth (*Id.* at p. 34). The dentures pushed on those areas, causing soreness (*Id.*). Chapman testified that he made the adjustments with a slow-speed drill in order to get the denture around the excess bone (*Id.* at 33-34, 38). Chapman testified that adjustments were quite common for new dentures because as the dentures settle, there are spots that will rub the gum and require adjusting (*Id.* at 33). The medical notes indicate that Plaintiff felt the dentures were a lot better (Doc. 102-4, p. 2). Chapman testified that if the dentures did not ultimately work, he would either order new dentures or go to the next step (Doc. 102-5, p. 36).

Plaintiff testified that the first time the dentures were put in, the dentures pressed on his gums and caused pain (Doc. 102-1, p. 26). Plaintiff told Chapman the dentures did not feel right, but Chapman told him he would have to get used to them (*Id.* at p. 27). Plaintiff testified that he only wore the dentures the one time and that he did not wear them after that (*Id.* at p. 21). Plaintiff testified that when he put the dentures back in the second time, after Chapman made some adjustments, the dentures hurt his gums and he stopped wearing them (*Id.* at p. 26-27). Plaintiff filed a grievance on August 15, 2013, indicating he received his dentures on August 14, 2013 and it was causing him "excruciating pain" (Doc. 114-3, p. 11).

After August 26, 2013, Chapman testified that he set Plaintiff to be seen at Plaintiff's request, which would be done by Plaintiff submitting a written request for adjustment (Doc. 102-5, p. 39). Plaintiff requested an adjustment because his bite was off on the left side (*Id.*). Plaintiff was seen on September 11, 2013 (Doc. 102-4, p. 2). Chapman adjusted the dentures again (*Id.*). Chapman testified that adjustments are a process that has to be done slowly as once a piece of the denture is shaved off, it cannot be replaced (Doc. 102-5, p. 40). The area has to be slowly taken down until it fits comfortably and if too much is taken off, the dentures will not fit properly (*Id.*). Chapman saw Plaintiff again on September 19, 2013 (Doc. 102-4, p. 2). Adjustments were made to the left back of the dentures as Plaintiff indicated he was biting his cheek (Doc. 102-5, p. 40). Plaintiff was specifically biting a saliva gland duct (*Id.*). Chapman again adjusted the denture so that Plaintiff was not biting his cheek (*Id.*). Chapman ordered Plaintiff's soft diet to continue for two additional weeks but counseled Plaintiff that he needed to get used to the dentures (*Id.*). Plaintiff was scheduled to be seen only at Plaintiff's request (*Id.*).

On November 5, 2013 Plaintiff wrote a kite indicating that he was still have troubles with his denture and was seen by Chapman (Doc. 102-4, p. 3; 102-5, p. 42). However, Plaintiff forgot his dentures and the appointment was rescheduled for November 7, 2013 (*Id.*). Plaintiff was seen again on November 7, 2013 and Chapman adjusted the pallet portion of the denture and Plaintiff indicated that it felt better (*Id.*). Plaintiff, admittedly, made no requests for adjustments after November 2013 (Doc.

114-2, p. 1). Chapman did not receive any further requests from Plaintiff regarding his dentures (Doc. 102-5, p. 42).

Plaintiff testified he did not contact Chapman was because the dentures were destroyed (*Id*.). Plaintiff testified that he stopped wearing them after the second time because they kept hurting (Doc. 102-1, p. 27). He made a request to see Chapman and Chapman kept sanding on them (*Id*.). Plaintiff testified that he sanded them down so much that they didn't fit well (*Id*. at p. 28). Plaintiff testified when Chapman would sand one side down, that side would then be okay, but the sanding would cause problems on the other side of the denture and that it kept going back and forth from side to side (*Id*. at p. 28). Plaintiff testified that after a side was sanded it would feel okay for a minute but then the other side would not be right (*Id*. at p. 29).

Plaintiff next saw Chapman on May 20, 2014 for a toothache (Doc. 102-4, p. 3). The tooth was ultimately extracted (Doc. 102-4, p. 3; 102-5, p. 43). Plaintiff was seen on June 10, 2014 for a denture adjustment but Plaintiff forgot the denture and the appointment was rescheduled (Doc. 102-4, p. 3; 102-5, p. 45). Plaintiff was seen again on June 16, 2014 but at that time Plaintiff indicated that the denture was fine and signed a refusal of treatment (*Id*.). Plaintiff refused a two-year exam on November 24, 2014 (Doc. 102-4, p. 3). He transferred to Jacksonville on July 22, 2015 (Doc. 56). Plaintiff was seen for a denture adjustment on March 4, 2016 and asked for a soft diet (Doc. 102-4, p. 3). It was noted that the palatal surface seemed self-adjusted and that it needed to be re-adjusted (Doc. 102-4, p. 4). Plaintiff was seen on April 16, 2016 and it was noted by

the dentist that the denture needed either adjusted or remade (*Id.*).

As to Defendant Little, Plaintiff testified that she continued to charge him a co-pay for pain medication instead of referring him to the doctor (Doc. 102-1, p. 18-19, 31). Plaintiff believed that he had a chronic problem which would not require him to be charged a co-pay every time (*Id.* at p. 31). Little testified that she saw Plaintiff on one occasion and provided him with Motrin (Doc. 102-6, p. 15). The Motrin was a one-time dose of ten pills (*Id.*). The other two times, Plaintiff refused to pay the co-pay (*Id.*).

Plaintiff had received a Motrin prescription for his right hand related to a cyst while at Menard (Doc. 102-8). Pain associated with the wrist was not a chronic issue, thus Plaintiff had to see the nurse three times before being seen by the doctor (Doc. 102-6, p. 16; 102-7, p. 2). A nurse cannot determine whether a condition is chronic and a regular Nurse Sick Call, for non-chronic conditions, requires a $5.00 co-pay (Doc. 102-7, p. 2). A co-pay is not required at chronic clinic visits but a patient with undiagnosed chronic pain must complete the Nurse Sick Call process before being seen by a doctor (*Id.*).

The first time Plaintiff was seen by Little, on September 6, 2013, Little testified that his symptoms were inconsistent. He first complained of pain in his left wrist and then switched, indicating that the pain was in his right wrist (Doc. 102-6, p. 17; 102-9, p. 1). He complained of generalized pain and Little did not note a cyst (*Id.* at p. 17-18). Little did not note any bruising or swelling and Plaintiff had good range of motion (Doc. 102-9, p. 1). Plaintiff was provided with Motrin and charged a $5.00 co-pay (*Id.*). There is no

indication in the medical records that Plaintiff complained of tooth pain (*Id.*). Plaintiff was seen by Little again on September 12, 2013 and demanded more Tylenol but indicated that he would not pay the co-pay (Doc. 102-9, p. 2; 102-6, p. 19). Plaintiff refused the Nurse Sick Call, continued to argue about the co-pay, and was escorted out by security (*Id.*). Plaintiff was seen again on September 20, 2013 for pain in his wrist but again refused to pay for what he called an "ongoing issue" and refused the Nurse Sick Call (Doc. 102-9, p. 3). Plaintiff filed grievances against Little describing her as rude and sarcastic and complained that she refused him pain medication he took for a hand injury, chronic headaches, and jaw bone structure (Doc. 114-3).

## LEGAL STANDARDS

### A. Summary Judgment Standard

Summary Judgment is proper only "if the admissible evidence considered as a whole shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." ***Dynegy Mktg. & Trade v. Multi Corp.*, 648 F.3d 506, 517 (7th Cir. 2011) (internal quotation marks omitted) (citing FED. R. CIV. P. 56(a)).** *See also **Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005).** The party seeking summary judgment bears the initial burden of demonstrating—based on the pleadings, affidavits, and/or information obtained via discovery—the lack of any genuine issue of material fact. ***Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).**

After a properly supported motion for summary judgment is made, the adverse

party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)(2)). A fact is material if it is outcome determinative under applicable law. *Anderson*, 477 U.S. at 248; *Ballance v. City of Springfield, Ill. Police Dep't*, 424 F.3d 614, 616 (7th Cir. 2005); *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "A mere scintilla of evidence in support of the nonmovant's petition is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion." *Albiero v. City of Kankakee*, 246 F.3d 927, 931–32 (7th Cir. 2001) (citations and quotations omitted).

On summary judgment, the Court considers the facts in the light most favorable to the non-movant. *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009). The Court adopts reasonable inferences and resolves doubts in the nonmovant's favor. *Id.*; *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals that "alternate inferences can be drawn from the available evidence." *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004), *abrogated on other grounds by Spiegla II*, 481 F.3d at 966 (7th Cir. 2007). *See also Anderer v. Jones*, 385 F.3d 1043, 1064 (7th Cir. 2004).

B. **Deliberate Indifference**

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted)). Accord *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) ("Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."). A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm — not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011), citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006). The first prong that must be satisfied is whether the prisoner has shown he has an objectively serious medical need. *Arnett*, 658 F.3d at 750. Accord *Greeno*, 414 F.3d at 653. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Accord *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the *Eighth Amendment* requires "deliberate indifference to a *substantial* risk of *serious* harm.") (internal quotation marks omitted) (emphasis added). Only if the objective prong is satisfied is

it necessary to analyze the second, subjective prong, which focuses on whether a defendant's state of mind was sufficiently culpable. *Greeno v. Daley*, **414 F.3d 645, 652– 53 (7th Cir. 2005).**

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno*, **414 F.3d at 653.** The plaintiff need not show the individual literally ignored his complaint, just that the individual was aware of the serious medical condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, **546 F.3d 516, 524 (7th Cir. 2008).**

## ANALYSIS

### A. Nathan Chapman

Defendant Chapman does not dispute that Plaintiff suffered from a serious medical condition. Instead, Chapman argues that he was not deliberately indifferent to Plaintiff's serious medical needs as he provided Plaintiff with dentures. Here the evidence indicates that Plaintiff believed that he should have been referred for oral surgery to remove the excess bone in his gums or that Chapman should have waited longer for his gums to heal. But a plaintiff is not entitled to choose specific treatment, nor does a disagreement with the doctor's treatment constitute deliberate indifference, *Forbes v. Edgar*, **112 F.3d 262, 267 (7th Cir. 1997);** *Ciarpaglini v. Saini*, **352 F.3d 328, 331 (7th Cir. 2003).** Further, the evidence in this case suggests that Chapman was exercising his professional judgment when he decided to provide Plaintiff with dentures

rather than send him for oral surgery. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)("**The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment.**"). While Plaintiff points to his medical records from Menard Correctional Center as proof that he needed surgery to remove the excess bone, the dental records from Menard indicate that the dentist there believed that he needed further healing *or* possible pre-prosthetic surgery (Doc. 102-4, p. 1). There is no indication in that note that pre-prosthetic surgery was the required course of treatment, rather that Plaintiff would need to be re-evaluated in three months to determine if upper dentures should be ordered or pre-prosthetic surgery was necessary. Chapman then evaluated him almost a year later and determined that Plaintiff's gums had healed within normal limits and that Plaintiff's mouth was ready for dentures. Chapman acknowledged that Plaintiff had excess bone and an undercut on his ridge, but Chapman believed that he could make the dentures work with Plaintiff's mouth structure.

  Chapman then proceeded to have the dentures made, taking impressions and wax bites to determine Plaintiff's bite. Chapman had dentures made by the lab and had them reset twice to fit Plaintiff's mouth. As Chapman testified, impressions were sent to the lab and if the lab could not craft dentures to fit Plaintiff's particular mouth structure, they would have contacted Chapman, which they did not. There is no

indication that Chapman was deliberately indifferent in deciding to proceed with dentures rather than surgery for Plaintiff's mouth. Chapman examined Plaintiff's mouth and the x-rays and believed, in his professional opinion, that dentures could work with Plaintiff's mouth structure. Plaintiff has offered no evidence that Chapman's judgment was such a "significant…departure from accepted professional standards or practices" to be considered deliberate indifference. *Pyles*, **771 F.3d at 409.**

Plaintiff, however, argues that Chapman was deliberately indifferent because he continued with an ineffective course of treatment. Plaintiff argues that after he received the dentures, Chapman chose to repeatedly grind and sand the dentures, even though Plaintiff continued to complain of pain, and failed to send him to an outside oral surgeon when the dentures did not work. While an ineffective course of treatment can amount to deliberate indiffere4nce, the Court does not find that this is such a case where a doctor continues with the same treatment despite evidence that the treatment is not working. See *Greeno v. Daley*, **414 F.3d 645, 655 (7th Cir. 2005) (finding deliberate indifference where medical defendants persisted in a course of conservative treatment for eighteen months despite no improvement).** *See also Kelley v. McGinnis*, **899 F.2d 612, 616 (7th Cir. 1990) (deliberate indifference when doctor continues with treatment knowing it to be ineffective);** *Berry v. Peterman*, **604 F.3d 435, 441 (7th Cir. 2010)(case survived summary judgment where evidence in the record suggested that doctor had not identified effective pain medication or the cause of tooth pain, but refused to refer to seek obvious alternative of referring inmate to a dentist).**

As Defendant Chapman points out and the record reflects, Chapman worked with Plaintiff on numerous occasions to adjust the dentures. Chapman adjusted the dentures on several occasions in August, September, and November. However, after November, Plaintiff did not complain about the dentures to Chapman. There is no indication in the record that Plaintiff reported any additional issues with the dentures to Chapman. Chapman testified that had the dentures ultimately not worked for Plaintiff, new dentures could have been ordered or a different route could have been taken, but there is no evidence to suggest that Chapman was aware that Plaintiff continued to have issues with the dentures. In fact, Plaintiff admitted that he did not contact Chapman after November 2013 and the records reflect that Plaintiff refused further adjustment in June 2014, reporting that the dentures were fine.

Further, the evidence in the record indicates that Plaintiff did not even participate in the prescribed course of treatment. Plaintiff testified that he only wore the dentures on one occasion and after he put them on a second time in August, he never wore them again. Plaintiff admitted that Chapman counseled him to wear the dentures so that his mouth could adjust to them, but Plaintiff refused to wear the dentures. While Plaintiff may not have agreed with Chapman's medical decision to provide him with dentures, Plaintiff should have at least participated in the prescribed course of treatment in order to determine that it was not effective. "[W]hen a prisoner chooses not to receive treatment…, the doctor is not deliberately indifferent." *Blankenship v. Birch*, **590 F. App'x 629, 633 (7th Cir. 2014)** *amended on reh'g in part*, **785 F.3d 1174 (7th Cir. 2015)** *and*

*cert. denied*, **No. 15-5699, 2015 WL 4944469 (U.S. Oct. 19, 2015).** Here, Plaintiff failed to participate in the prescribed treatment as he refused to wear the dentures. As such, the Court finds no deliberate indifference on Chapman's part.

### B. Brandi Little

The Court also finds no evidence of deliberate indifference on Brandi Little's part. Plaintiff argues that he complained of two chronic pain conditions and that Little failed to provide him with medication or refer him to a doctor. However, there is no evidence to suggest that Plaintiff had a diagnosed chronic illness such that he qualified for the chronic illness clinic in order to receive pain medication without a co-pay, which is ultimately the relief Plaintiff sought from Little - to not pay a co-pay for his pain medication. The records indicate that Plaintiff presented to Little on three occasions, each time seeking pain medication, according to medical notes for pain in his hand. Little noted no swelling and found Plaintiff's hand to have good range of motion. There is no evidence that Plaintiff displayed symptoms that would require immediate attention by a doctor. As a nurse, Little could also not diagnose Plaintiff with chronic pain nor could she provide him with pain medication without a co-pay without a chronic pain diagnosis. The evidence indicates that Little examined Plaintiff and provided him with pain medication at a co-pay of $5.00. When Plaintiff returned to Little on two additional occasions he refused treatment because he refused to pay the $5.00 co-pay. There is no evidence to suggest that Plaintiff could not pay the co-pay or that he had a diagnosed chronic condition which would have entitled him to medication

without the co-pay. *Poole v. Isaacs*, 703 F.3d 1024, 1027 (7th Cir. 2012). Instead, Plaintiff chose to refuse care rather than pay the co-pay, and such a refusal does not amount to deliberate indifference on Little's part. *Poole*, 703 F.3d at 1027 (**As the plaintiff had sufficient funds to pay the co-pay but refused to do so, the delay in receiving pain medication was his own making and did not constitute deliberate indifference).** Accordingly, Brandi Little is also entitled to summary judgment.

### C. Doug Simmons

As to Doug Simmons' motion for summary judgment, the Court finds no evidence of a continuing violation such that Plaintiff would be entitled to injunctive relief. The Court does find that Simmons, the warden at Plaintiff's current institution, is a proper party for injunctive purposes, despite Defendant's argument to the contrary. *See Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011)(**finding warden a proper party for purposes of ensuring that any injunctive relief awarded is carried out).** However, there is no evidence of deliberate indifference related to Plaintiff's dentures nor is there any evidence of a continuing violation. While Plaintiff testified that he does not currently have dentures, there is no evidence that this is due to any current deliberate indifference by any dental provider. As such, the Court finds that Simmons is entitled to summary judgment in the official capacity claim against him.

## CONCLUSION

Accordingly, the Court **GRANTS** both motions for summary judgment. As no

claims remain for trial, the Court **DIRECTS** the Clerk to enter judgment accordingly.

**IT IS SO ORDERED**.

DATED: March 6, 2017.

>	/s/ Stephen C. Williams
> STEPHEN C. WILLIAMS
> United States Magistrate Judge